SOUTHERN BELL TEL. AND TEL. CO. *v.* MISSISSIPPI PUBLIC
SERVICE COMMISSION.

No. 41026 July 2, 1959 113 So. 2d 622

158

*Butler, Snow, O'Mara, Stevens & Cannada,* Jackson; *Jefferson Davis,* Atlanta, Ga., for appellant.

*Joe T. Patterson,* Atty. Gen., by *Wade Creekmore,* Asst. Atty. Gen., *Thomas H. Watkins,* Jackson, for Mississippi Public Service Commission, appellee.

*W. O. Crain, Wilkinson, Lewis, Wilkinson & Madison,* Shreveport, La.; *Brunini, Everett, Grantham & Quin,* Vicksburg; *Avery & Putnam,* Jackson, for United Gas Corporation, amicus curiae.

*Wright, Overstreet, Kuykendall & Perry,* Jackson, for Mississippi Valley Gas Company, amicus curiae.

KYLE, J.

This case is before us on appeal by the Southern Bell Telephone and Telegraph Company from a decree of

the Chancery Court of Hinds County sustaining an order of the Public Service Commission setting aside and cancelling certain increased rates and charges for intrastate telephone services, filed by the appellant on June 25, 1956, and made effective under bond on July 26, 1956.

The record shows that on June 25, 1956, Southern Bell Telephone and Telegraph Company filed with the Public Service Commission new and revised schedules of rates and charges for intrastate telephone service in the State of Mississippi, pursuant to the provisions of Section 10 of Chapter 372, (House Bill No. 123), General Laws of Mississippi, Regular Legislative Session, 1956 (Sec. 7716-01 through Section 7716-38, Miss. Code of 1942, Recompiled). The new schedules of rates and charges were estimated to produce increased revenues of approximately $2,500,000 on an annual basis. The company served notice in its petition that the increased rates and charges would be made effective on July 26, 1956.

On July 20, 1956, the Public Service Commission issued an order suspending the proposed schedules of rates and charges for a period of not less than 90 days, and directing that Southern Bell "proceed without delay to prepare and present at open hearing full and complete justification in support of the proposed rates and charges." The Company, however, invoked the provisions of Section 10 of the above mentioned statute and filed a bond in the sum of $2,500,000, which was approved by the Commission on July 23, 1956, and the new rates and charges were made effective on July 26, 1956.

Public hearings in the matter were commenced on August 21, 1956, and concluded on November 20, 1956. Southern Bell and the Commission's staff each offered voluminous evidence in support of their respective claims, including oral testimony and numerous exhibits which have required careful study by us on this appeal.

On December 20, 1956, the Commission entered an order setting forth in detail its findings of fact; and in its order the Commission set aside and annulled the tariff of intrastate rates and charges filed by the Company on June 25, 1956, and directed that the Company make effective forthwith the tariff of rates and charges which were in effect on July 25, 1956. The Commission in its order also directed that the Company proceed forthwith to refund by check to each telephone subscriber the appropriate amount collected by it since July 25, 1956, in excess of the legal intrastate rates and charges which were in effect immediately prior to that date, with interest at the rate of six per cent per annum.

From that order the Company prosecuted an appeal to the Chancery Court of the First Judicial District of Hinds County, under authority of Section 26 of said Chapter 372, Laws of 1956 (Section 7716-26, Code of 1942, Recompiled). In its formal appeal the Company assigned 26 grounds for relief against the order of the Commission; and the Company asked that the order be set aside and canceled.

The chancellor took the case under advisement, and after a painstaking study of the record rendered an opinion on June 19, 1958, sustaining the findings and the order of the Commission in setting aside the increased rates which had been made effective under bond on July 26, 1956; and the chancellor entered a decree affirming the order of the Commission. From that decree the appellant has prosecuted its appeal to this Court.

Before undertaking to discuss the questions presented for our decision on this appeal it is necessary that we make a brief statement concerning the Southern Bell Telephone and Telegraph Company and its relation to the other members of the Bell System.

For convenience and brevity in stating the pertinent facts and discussing the questions presented for our decision on this appeal, we will hereafter refer to Southern

Bell Telephone and Telegraph Company as Southern
Bell or the appellant, to the Public Service Commission
as the Commission, and to the American Telephone and
Telegraph Company as The American Company or A. T.
& T.

Southern Bell is one of the largest telephone operat-
ing companies in the Bell System. It is a corporation
organized under the laws of the State of New York,
and is duly authorized to do business in the State of
Mississippi. It provides local exchange telephone ser-
vice and both intrastate and interstate toll service in
the 9-state area comprising Alabama, Florida, Georgia,
Kentucky, Louisiana, North Carolina, South Carolina,
Tennessee, and Mississippi.

Southern Bell and 19 other telephone companies con-
stitute what is commonly called the Bell System. This
telephone system through the several companies renders
nation-wide service and operates about 80 per cent of
all the telephone business in the United States. All of
the voting stock of most of these associated companies,
including Southern Bell, and the majority of the voting
stock of the others, is owned by the American Telephone
and Telegraph Company. The American Company also
owns 99.82 per cent of the voting stock of Western Elec-
tric Company, Inc., and 50 per cent of the stock of the
Bell Telephone Company Laboratories, Inc., both of
which are non-telephone companies. The former of these
two companies (Western Electric Company, Inc.) in turn
owns the other 50 per cent of the stock of the Bell Tele-
phone Laboratories, Inc. The Laboratories Company is
a research and development company, which is operated
for the benefit of the Bell System. The American Com-
pany holds an agreement called a License Contract with
each of its 20 subsidiary companies composing the Bell
System. Under it each subsidiary, including Southern
Bell, pays the American Company one percent of its
gross annual revenue for which, in turn, they each re-

ceive valuable services from Bell Laboratories. The payments made by Southern Bell for these services are included in the operating expense as is done by all of the other operating companies.

Southern Bell's rate of growth since World War II has greatly surpassed that of every other company in the Bell System. Southern Bell's average plant in service during the 12-months period ending June 30, 1956, was $1,485,057,665. Its average depreciation reserve was $290,821,877. The average net plant in service was $1,-194,235,788. Between January 1, 1946, and December 31, 1955, the number of telephones served by Southern Bell increased 163 per cent. In Mississippi, during the same period, there was an increase of 155.5 per cent in the number of telephones served by the Company.

Southern Bell's capital structure has undergone vast changes since the end of World War II. At the end of 1946 Southern Bell's capital and surplus aggregated the sum of $318,937,007, with a debt ratio of 32.9 per cent. At the end of 1947, the total capital and surplus aggregated the sum of $393,389,943, with a debt ratio of 45.8 per cent. At the end of 1948, its total capital and surplus aggregated the sum of $538,372,327, with a debt ratio of 33.5 per cent. At the end of 1955, its capital and surplus aggregated the sum of $1,189,883,945, with a debt ratio of only 22.3 per cent.

Despite a 72-day strike by certain of its employees during March, April and May in 1955, Southern Bell closed the year with earnings of $7.77 per common share, a new high record since at least 1945.

Since the end of World War II, Southern Bell has enjoyed five successive intrastate rate increases in Mississippi, aggregating $7,515,000 annually, as follows: $890,000 on May 1, 1947; $1,500,000 on March 4, 1948; $1,527,000 on April 6, 1949; $2,973,000 on October 26, 1951; and $625,000 on August 1, 1952.

The American Company's earnings during 1955 climbed to a record level since 1940. Its annual report to the stockholders for 1955 contains the following statement: "Earnings of the Bell System applicable to A. T. & T. stock were $13.10 per average share in 1955, compared with $11.92 in 1954. The rate of earnings on total capital in the business was 6.8 per cent. This compares with 6.2 per cent in 1954 and was in fact the best we have done since 1940."

As the Commission stated in its Opinion and Order in this case, "The business transactions between Southern Bell and the American Company are manifestly conducted at less than arm's length, and it is reasonable to assume that they are not unprofitable to the parent holding company. These transactions are of a substantial magnitude." According to its annual report for 1955, in addition to common stock dividends of $53,706,250, Southern Bell paid $4,835,844 that year in License Contract fees to the American Company, and $135,136,170 to Western Electric Company for supplies, equipment and services. The American Company is, of course, practically the sole beneficiary of the profits derived by Western Electric from this business.

The rate of return to which a regulated public utility is entitled is one of the most important questions which the Commission has to consider. Section 8 of Chapter 372, Laws of 1956 (Section 7716-08 (a), Code of 1942 Recompiled), provides that no rate demanded or received by any public utility shall exceed that which is just and reasonable, but such utility may demand, collect, and receive fair, just and reasonable rates, and that the rates prescribed by the Commission shall be such as to yield "a fair rate of return to the utility furnishing service, upon the reasonable value of the property of the utility used or useful in furnishing service." Section 11 of said act (Section 7716-11, Code of 1942 Recompiled), provides that "Whenever the commission,

after hearing had on reasonable notice finds that the existing rates in effect and collected by any public utility are materially excessive or insufficient or unreasonably discriminatory, or in anywise in violation of any provision of law, the commission shall determine the just and reasonable rates which will yield a fair rate of return to the utility for furnishing service, which rates will thereafter be observed and in force; * * *.'' Section 12 of said act (Section 7716-12, Code of 1942, Recompiled), provides that the commission shall ascertain and fix the rate base of the property, when the same is relevant or material; and, ''In arriving at such rate base the commission shall give due consideration to all elements that are generally considered in determining the rate base for rate making purposes.''

In rate making proceedings the practice usually followed is to test rates for the future upon the basis of actual operating experience of a representative period of time and to adjust that experience for changes that appear definite and certain. The objective of test year figures is to reflect typical conditions. In keeping with that practice Southern Bell in this case chose as its test period the 12 months ending June 30, 1956; and in view of the fact that the Company, only a few weeks before the filing of its petition, had signed a wage contract with its employees, which provided for an increase in wages, effective May 20, 1956, the Company adjusted the actual cost of operations during the test period, as shown in its books and records, so as to take into account the annualized impact of the wage increase.

According to the Company's records the total original cost of properties used in the Company's intrastate operations during the test period was $77,465,569. The depreciation reserve was $14,977,557. The original cost less depreciation reserve was $62,488,014. The Company's net operating income for the twelve months period ending June 30, 1956, was $2,846,841. From that amount

there was deducted the sum of $143,056 to reflect for a twelve months' period the amount of wage increases which became effective May 1, 1956. With that adjustment the going level of net operating income for the twelve months period was fixed at $2,703,785. Based upon the original cost less depreciation reserve, as shown above, the annual return on the Company's intrastate operations during the test year was 4.33 per cent.

The Company contended throughout the hearing that the original cost of the properties less depreciation reserve, as shown on the books of the Company, did not represent the reasonable value of the properties used in the Company's intrastate operations during the test period; that because of the increases in the cost of labor and materials since the close of World War II the reproduction cost new less depreciation value of the property far exceeded the original cost less depreciation; and that the fair or reasonable value of the properties used in the Company's intrastate operations during the test period was $72,000,000. The Company also contended that the rate of return derived from the Company's intrastate operations in Mississippi during the test period was inadequate and far below the reasonable rate of return which the Company was entitled to receive for the services rendered.

Fourteen witnesses testified for the Company in the presentation of its case in chief. The testimony of these witnesses covered a wide range of subjects, including not only the Company's intrastate operations in Mississippi during the test period but also its intercorporate relations with the Amerian Telephone and Telegraph Company, the parent organization, and the Western Electric Company, the manufacturer and supplier of material and equipment for all Bell operating companies, and including the general business conditions and economic trends of the past 25 years, and Southern Bell's operations in Mississippi during that period of time. The

most important part of the testimony, however, was the testimony relating to the Company's intrastate operations in Mississippi during the test period, its operating revenues, its operating expenses, and its net operating income during that period, the value of its plant in service, and the rate of return which the Company claimed it was entitled to receive on the capital invested in its Mississippi intrastate operations.

A. L. Groce, an Assistant Vice President of Southern Bell, gave a detailed account of the Company's intrastate operations during the postwar period, the increased demand for telephone service and the progress which the Company had made in its plant expansion program to meet that demand, the increased cost of construction of telephone plant, the net investment and the reasonable value of the Company's intrastate properties in Mississippi during the test period, and the Company's need for a higher rate of return on its plant properties.

Groce's Exhibit No. 1 showed that on December 31, 1945, Southern Bell had in service in Mississippi 149 exchanges, 115,876 telephones, 74 dial central offices, 5,066 miles of poles, 79,000 conductor miles of aerial wire, 341,000 conductor miles of wire in cable, and 25 company-owned buildings; and that on June 30, 1956, the Company had in service in Mississippi 159 exchanges, 307,424 telephones, 161 dial central offices, 12,522 miles of poles, 140,000 conductor miles of aerial wire, 1,167,-000 conductor miles of wire in cable, and 100 company-owned buildings. Groce's Exhibit No. 4 showed that the original cost of the Company's telephone plant in service, in its combined interstate and intrastate operations in Mississippi, on June 30, 1956, was $105,919,441; that the original cost of its plant in service in its intrastate operation on that date was $78,837,009; that the original cost of plant under construction for combined interstate and intrastate operations was $2,466,117; that the original cost of plant under construction for intra-

state operations was $1,768,568; that the original cost of property held for future telephone use in combined interstate and intrastate operations was $288,529; that the original cost of property held for future telephone use in intrastate operations was $192,651. The same exhibit showed materials and supplies on hand for combined interstate and intrastate operations, $1,082,045; materials and supplies on hand for intrastate operations, $853,950; cash requirements for interstate and intrastate operations, $248,021; cash requirements for intrastate operations, $185,122; total original cost of properties, combined interstate and intrastate operations, $110,004,153; total original cost of properties, intrastate operations, $81,837,300. Groce's Exhibit No. 9 showed that the original cost of the Company's property used in its Mississippi intrastate operations during the 12 months ending June 30, 1956, was $77,465,569; that the depreciation reserve was $14,977,555; and that the original cost less depreciation reserve was $62,488,-014, as stated in a preceding paragraph of this opinion. Groce's Exhibit No. 10 showed that on December 31, 1945, the Company's intrastate net investment in Mississippi was $15,763,941.

Groce testified that the reasonable value of the Company's intrastate properties as of June 30, 1956, was $72,000,000; that a fair rate of return on that value as a rate base was 6.75 per cent; that the actual rate of return being received on a $72,000,000 valuation was 3.92 per cent; that the deficiency in amount of net operating income required to produce a return of 6.75 per cent on such valuation was $2,037,600; and that, excluding $71,451 interest charged on construction, the additional amount of gross revenue required to offset the deficiency in net operating income was $4,571,429. Groce stated that the amount of the increase in annual gross revenue provided for in the rates made effective under bond July 26, 1956, was $2,582,500. That amount

would enable the Company to realize an annual rate of return of 5.46 per cent on the reasonable value of its intrastate properties; but the amount was $1,988,929 less than the amount actually needed to produce a rate of return of 6.75 per cent on the $72,000,000 valuation mentioned above.

Dr. John K. Langum, an economic consultant, with many years experience in advising business firms and financial institutions on economic matters, testified concerning the depressing effects of the postwar inflation on the dollar value of corporate dividends and on invested capital, the current cost of capital, the earnings of the Bell System, and its need for a higher rate of return on its invested capital. Dr. Langum was of the opinion that a sound capital structure for Bell financing consisted of 35 per cent debt and 65 per cent equity capital. From studies which he had made of the market yields on bonds and the net cost of new debt issues of electric utility companies, Dr. Langum concluded that the current cost of debt capital for a Bell System company like Southern Bell would be about 3.25 to 3.30 per cent. From the studies which he had made of the cost of equity capital, including a study of the experience of AT&T in raising equity capital during the period from 1950 through June 1956, when the average price received by the Company for new stock issues amounted to $138.91, per share, Dr. Langum had concluded that the cost of equity capital to the Bell System was 9.0 per cent, and that the current overall cost of capital to Southern Bell, with a capital structure of 35 per cent debt and 65 per cent equity, was 6.8 per cent to 7.0 per cent. On cross-examination Dr. Langum admitted that he had never testified for consumer groups in a rate case. He also admitted that the percentage cost of capital had not kept pace with the consumer price index or the general price level. He would not agree that there had been a general decline in the yield in common stocks

since 1940; but he admitted that the yield for the year 1955 was somewhat lower than the yield for 1940. Dr. Langum agreed that, if the average price received per share for AT&T stock had been higher than the 138.91 which his study showed, the ratio of earnings to price which he had used as a basis for the determination of the cost of equity capital would have been lower.

B. F. Hatfield, an assistant vice president of Southern Bell, testified concerning the reproduction cost less depreciation of plant properties in Mississippi and the reasonable value of the property used in the Company's intrastate operations during the test period. Hatfield's testimony will be discussed more in detail later.

Dr. W. Edward Deming testified concerning the method of sampling and the sampling procedures which he had prepared for J. C. Underwood, plant manager, to be used in determining the physical depreciation of the plant properties. J. C. Underwood testified concerning the physical depreciation of the plant property, as determined by inspections made under his supervision, and the use of sampling procedures as outlined by Dr. Deming.

D. F. MacEachern, a general accountant in the comptroller's office of AT&T, testified concerning the intercorporate relationship between AT&T and its operating companies and other subsidiaries; the services rendered by AT&T under the License Contract, the costs incurred and the capital employed by AT&T in rendering the services called for under the License Contract; AT&T's ownership of the Long Lines Department, which operates long distance interstate lines throughout the United States and other parts of the world; the General Department, which, under the License Contract, performs various services required in common by the operating companies; and the work and organization of Bell Telephone Laboratories. J. D. Porter, an assistant vice president of Southern Bell Company, testified concern-

ing the benefits received by Southern Bell under the License Contract, and differences between intrastate and interstate toll service charges for long distance telephone calls to points within the state and points without the state.

J. A. Davis, supplies superintendent for Southern Bell, testified concerning the advantages of the Standard Supply Contract with the Western Electric Company; and G. V. Seymour, superintendent of public statistics in the comptroller's department of the Western Electric Company, testified concerning the operations of Western Electric as the manufacturing, purchasing and supply unit of the Bell System. Frank K. Wurst, an engineer in the Department of Operating and Engineering of the American Company, testified concerning the prices which the Western Electric Company charged the Bell System companies for telephone material and supplies.

W. H. Bailey, an assistant vice president of Southern Bell, testified concerning the increase in the public demand for telephone services in Mississippi; the large sums of capital which Southern Bell was required to raise; and the rate of return which was needed to maintain confidence in the Bell System's financing. Bailey stated that the controlling factors in the determination of the proper debt ratio for any company are the stability of earnings and the risks involved in the business; and that the most appropriate basis for testing the propriety of the debt ratio of any affiliate in the Bell System is by reference to the electric utility industry. His testimony in this respect follows:

"Q. Why do you compare the debt ratio of the Bell System with the electric industry and not with other types of business?

"A. Both the electric companies and the Bell System are public utilities subject to regulation. Neither can, under regulation, earn enough to retire the debt from profits. Both use the capital for building

plant which, once placed, will be needed indefinitely in the future. Each is faced with need for constantly increasing amounts of capital, and with needs for repeated trips to the money market to secure the capital. * * * Other utilities have fewer characteristics common or similar to the telephone industry.''

While Bailey acknowledged the propriety of a 50 per cent debt ratio for the electric utility industry, he claimed that a one-third debt ratio was appropriate for the telephone industry. It was his view that the telephone industry involved greater risk than the electric utility industry and should therefore have a much lower debt ratio. He stated that the one-third debt ratio policy of the Bell System was proper, and that a 6.75 per cent rate of return on the reasonable value of Southern Bell's properties employed in furnishing intrastate telephone service in Mississippi was the lowest limit of earnings which could be considered adequate to assure confidence in the financial soundness of the business. Bailey stated that Southern Bell's earnings in Mississippi on its intrastate operations at the time of the hearing were at the rate of $5.40 a share, a rate substantially below the cost of common equity capital furnished by AT&T. Bailey stated that the reasonable cost of equity capital for the Southern Bell Company, with a capital structure of one-third debt and two-thirds common stock was 8.5 per cent; and this figure combined with 3.25 per cent cost of debt made the overall cost of capital 6.75 per cent.

Russ M. Johnson, Executive Vice President of the Deposit Guaranty Bank and Trust Company in Jackson, Mississippi, testified that an adequate earning power was essential to enable a public utility to attract investors; and that, in his opinion, Southern Bell's one-third debt ratio was proper and the Company should have a rate of return of 6.9166 per cent on the present value

of its properties in Mississippi. This opinion was based upon the assumption of a capital structure of one-third debt and two-thirds equity capital, the equity capital to have an 8.75 per cent rate of return, and the debt capital 3.25 per cent.

It is not necessary that we undertake to review in detail the testimony of each of the above named witnesses or other witnesses who were called to testify during the hearing before the Commission. But in view of the fact that much of the argument of the appellant's attorneys on this appeal has been directed against the Commission's refusal to give favorable consideration to Hatfield's estimate of $72,000,000 as the reasonable value of the appellant's property and the Commission's failure to adopt that figure as a rate base, it is necessary that we give a brief summary of Hatfield's testimony and the testimony of the witness Underwood, plant manager, who determined the physical and functional depreciation of the property for Hatfield.

Hatfield testified that the task assigned to him in the preparation of the Company's case for a hearing on the application for an increase in telephone rates and charges was that of determining the reasonable value of the Company's property used and useful in furnishing telephone service in Mississippi during the test period. He proceeded to execute that assignment by determining the cost of reproducing the property new on the basis of present-day prices of labor and materials, and deducting from that amount the actual depreciation as determined by Mr. Underwood. Hatfield stated that the original cost of the Company's property in Mississippi as of June 30, 1956, as shown by the Company's books of account, was $110,004,153. The original cost of the property allocated to intrastate operations in Mississippi was $81,837,300. Hatfield stated that the original cost was not an accurate measure of the reasonable value of the property, however, because it rep-

resented investments made in properties at different times under different cost levels without giving full effect to the inflationary cost of construction. Hatfield stated, and presented tabulations to show, that the average basic weekly wage of plant craftsmen had increased 86 per cent during the postwar period, and that the increases in the prices of basic materials during the postwar period ranged from 23 per cent for telephone stations, 27 per cent for iron wire, and 43 per cent for poles, up to 94 per cent for underground cable.

Hatfield stated that he used several appraisal methods to determine the reproduction cost of telephone plant during the test period. He applied a unit cost method in determining the reproduction costs of exchange pole lines, toll pole lines, exchange aerial cable, exchange and toll aerial wire, underground conduits, underground cable, and buried cable and wire, telephone station apparatus and installations, private branch exchanges, booths and special fittings and buildings. The unit cost method involved the preparation of unit costs which could be applied to the known quantities or units of property listed on the inventory of the Company's properties to determine the reproduction cost new of the entire property account. In estimating the unit cost of an item of plant, Hatfield stated it was necessary for him to consider the prices of materials, the freight rates, labor costs, sales taxes, engineering overhead and supervision, and other miscellaneous expenditures such as motor vehicle expense and public liability insurance. All material prices used in the estimates were those prevailing on June 30, 1956. The sources from which these prices were obtained included the Western Electric Company's established price lists as of June 30, 1956. Non listed prices were obtained from outside suppliers or by some other means. The unit cost method was used on 69 per cent of the plant property. An index method was used on 23.5 per cent of the property, including manual

central office equipment, dial central office equipment, toll central office equipment, large dial and multiple manual private branch exchange, and motor vehicles. A sampling method was applied to furniture and office equipment. A principal item method was applied to tools and work equipment. An original cost method was used on the remaining 6.2 per cent of the property, which included lands and improvements on leased property, toll aerial cable, toll underground cable and buried cable, submarine cable, exchange and toll right of way, radiotelephone equipment, tele-typewriter equipment, etc.

Hatfield stated that he made final adjustments of his estimates of reproduction cost to reflect properly the employee wage increases granted on May 20, 1956, and to include net additions of plant placed in service between March 31, 1956, to June 30, 1956. The reproduction cost of the Company's plant in service in Mississippi as of June 30, 1956, was $124,352,864. To that amount there was added the actual original cost of telephone plant under construction, property held for future telephone use, materials and supplies, and cash requirements, making a total of $128,437,576. The intrastate portion of that amount was $93,392,930. The estimated amount of depreciation which existed in the property as of June 30, 1956, as determined by J. C. Underwood, the plant manager, was 18.78 per cent, or, in terms of dollars, $17,534,595, when related to the reproduction cost new of the intrastate property. When this amount was deducted from the reproduction cost new of the intrastate property, the balance, representing reproduction cost new less existing depreciation, amounted to $75,858,335. Hatfield fused the original cost of the property, the reproduction cost new, and the reproduction cost new less depreciation, and concluded that $72,000,000 represented "the fair and reasonable value" of the Company's intrastate properties in Mississippi.

On cross-examination Hatfield stated that he did not inspect the property for the purpose of determining the amount of the depreciation. Mr. Underwood and his sixty inspectors made that inspection. Hatfield stated, however, that he made a close examination of a lot of the property, including many of the buildings and many of the central offices. He went down in several manholes and examined them; and he examined the underground cable in the manholes, or at least that part of it which was exposed to view. He could not testify about the condition of the underground cable. He depended on Mr. Underwood for that. Hatfield was asked to take a piece of drop wire and give his opinion as to the per cent condition that it was in. He stated that he was not prepared to do that. Hatfield stated that the reproduction cost which he had determined was the cost of reproducing the same property today, and not a completely modernized substitute plant. ' ''It is the same property that's involved, not a different property.'' He was asked how he determined the reproduction cost new of a hand telephone set which was no longer manufactured. He stated that he obtained from the Western Electric Company a price which would have been the price Western Electric would have charged if Southern Bell had placed an order for a sufficient number of the older sets to permit Western Electric to manufacture the sets on today's quantity basis.

Hatfield stated that it would be a complete waste of the ratepayers' money to dismantle all of the existing property and put in new property. He stated that the hand telephone sets still in use had been depreciated heavily, and the same thing was true as to the 302 type telephone sets which were being gradually replaced by a new 500 type telephone. He stated that the 500 type telephone made it possible for the Company to use finer gauge cable and to go farther out from the central office than with the gauge of the cable that it was using. Hat-

field stated that it would be uneconomical, however, for
the Company to retire 302 type telephone sets, and sub-
stitute 500's for them, in order to be able to retire some
22-gauge cable and substitute 26-gauge cable for it.
Hatfield was asked: ''If you were reproducing the prop-
erty in Mississippi, the entire plant, would the loca-
tion of the central offices and all other facilities be
precisely the same as their present location?'' His ans-
wer was: ''If I were reproducing the property, I would
have to determine where I could locate the central offices
so as to give the most economical plant; but I am not
reproducing the property in Mississippi.'' He did not
know whether, if the property were reproduced, the
central offices would be located in the same places or
not. Hatfield admitted that his exhibit showing in-
creases in wage rates during the last ten or fifteen years
did not show the reduction in the number of employees
which had been brought about by technological develop-
ments. Hatfield was asked how he determined the re-
production cost of telephone poles. His answer was
that he took the pole prices from Western Electric's
catalogue. He stated that poles on which he obtained
prices were Southern pine poles, creosoted in Missis-
sippi. They might vary in quality slightly, and there
might be some variations in the treatment, but by and
large they were the poles that were in service. He ad-
mitted that he did not get prices on poles from any one
other than Western Electric.

Hatfield stated that, in arriving at his estimate of
$72,000,000 as the reasonable value of the Company's
intrastate properties, he had taken into consideration
the characteristics of the territory served, the history
of the Company, the suitability of the facilities provided
by the Company for rendering telephone service to its
subscribers, the character of the organization, and the
quality of service rendered, and the contractual relation-
ship of the Company with other members of the Bell

System. But he was unwilling to attach a dollar value to any of those factors.

J. C. Underwood testified that he supervised the inspections made by 60 Company employees for the purpose of determining the per cent of depreciation of the Company's property. He defined depreciation as the loss in service value which is not restored by current maintenance. Physical depreciation is the deterioration which exists in the plant because of wear and tear, usage and the effects of weather and other conditions. Existing functional depreciation is the loss in value of the plant resulting from its clearly foreseen retirement principally due to inadequacy, obsolescent and public requirements. Underwood stated that four steps were followed in determining the depreciation: (1) Selection of representative items of property to be inspected; (2) selection and training of inspectors; (3) actual inspection of the property; and (4) evaluation and weighting of the findings of the inspectors into a per cent physical condition figure. He stated that representative samples of the property were inspected instead of all of the property, because the plant was made up of such large numbers of items of property that inspection of any large percentage of such items would have been impracticable and the cost prohibitive. The random numbers and instructors for the selection of the representative items of property to be inspected were furnished by Dr. Deming. Underwood had three assistants to help him in supervising the inspection. Underwood evaluated the reports of the inspectors into per cent physical condition by assigning values to each code letter used by the inspectors. It was not practicable to inspect buried cable or submarine cable. The same per cent condition as found for underground cable was assigned to buried cable and submarine cable. On cross-examination Underwood testified that Dr. Deming's instructions included the method of selecting the sample, but did not include instructions as to how the inspections were to be made.

Arnold Hirsch, a member of the Commission's staff, testified against the proposed increases in telephone rates. Hirsch testified that he was a public utility consultant, and had had 35 years experience in public utility regulation and rate-making, and that he had testified as a specialist in rate-making in several telephone cases affecting the Bell System. He had been retained by the Mississippi Public Service Commission to assist the staff in the present case on August 1, 1956.

Hirsch presented a number of exhibits covering Southern Bell's investment in telephone plant in Mississippi during the 12-months' period ending June 30, 1956, as shown by the Company's books. Hirsch's Exhibit No. 4 showed telephone plant in service during the 12-months' period, $75,400,705; telephone plant under construction, $1,497,822; property held for future telephone use, $145,-687; materials and supplies, $899,132; cash requirements, $156,068; total gross investment, $78,099,414; depreciation reserve, $14,978,347; and net investment $63,121,067. Based upon the net investment of $63,121,067, Hirsch stated that the Company's net operating income of $2,-703,785, as reflected by Groce's exhibits, represented a rate of return of 4.29 per cent. Hirsch stated, however, that the item of telephone plant under construction, $1,-497,822, should not be included in the rate base for the reason that the Company capitalized plant under construction at 5 per cent, and under the Uniform System of Accounts, when that plant goes into service, the Company includes interest which has accrued on the amount invested during the construction period as a part of the cost of the plant. Hirsch also stated that the items, "materials and supplies, $899,132", and "cash requirements, $156,068", mentioned above, should not be included in the rate base for the reason that the Company has available at all times reserves for Federal income taxes, state income taxes, and property taxes, which have been contributed by the ratepayers and which far exceed the in-

vestments in materials and supplies and the cash requirements referred to. The Company has the use of that money and can use the same for the payment of materials and supplies, or for any other corporate purpose, and to the extent that such accruals are available to the Company, such accruals should be used as an offset against the Company's requirements for materials, supplies and cash.

Hirsch's Exhibit No. 6 showed that if the three items, telephone plant under construction, material and supplies, and cash requirements were eliminated, the Company's adjusted net average investment would be $60,-568,045, and with a net operating income of $2,703,785, the adjusted rate of return would be 4.46 per cent. Hirsch's Exhibit No. 7 showed that the Company's earned rate of return for the 12 months ending June 30, 1956, on its combined intrastate and interstate operations in Mississippi, as indicated by the Company's books and based on its prevailing capitalization, was 5.52 per cent. Hirsch's Exhibit No. 8 showed that the Company's earned rate of return for the 12-months' period from its system wide operations, as indicated by the Company's books and based on prevailing capitalization, was 6.25 per cent. Hirsch stated that the rate of return would have been higher if the Company's debt ratio had been higher. Hirsch's Exhibit No. 9 showed that the Company's earnings per share for the year 1953 was $7.55; for the year 1954, $7.57; and for the year 1955, $7.77.

Hirsch stated that AT&T's purchase of Southern Bell stock at $100 per share gave AT&T a distinct advantage over the purchase of other types of common stock, because under the consolidated Federal Income Tax return AT&T received all of its dividends from Southern Bell tax free. AT&T would not enjoy such advantage as that if it had to go into the open market as an investment company and invest its funds in the common stocks of other companies. If it purchased the common stock of

the other companies, it would have to pay the Federal Income tax of 52 per cent on 15 per cent of all common stock dividends it received; and to obtain the same dollar return upon its investment, it would be required to invest $108.46 in the common stock of such other companies for each $100 invested in the common stock of its own subsidiaries.

Hirsch was of the opinion that Southern Bell's capital structure was top heavy with common stock, and that its debt ratio was entirely too low. Hirsch stated that the capital structure of a utility vitally affects the net earnings of the Company. A long-term debt is cheaper than equity capital. Interest paid on long-term debt is deductible for income tax purposes; and since income taxes are charged against the telephone subscribers as operating expenses, if those taxes are reduced, such reduction benefits the telephone subscriber. Hirsch stated that Southern Bell's low debt ratio penalized the subscriber, in that the subscriber must pay higher income taxes as a part of the operating expenses which are assessed against the ratepayer. A high ratio of equity capital also requires a greater return on the rate base. A 6.0 or 6.5 per cent requirement for the payment of dividends on equity capital is much higher than a three per cent requirement for debt charges.

Hirsch stated that he agreed with the Company's witness, W. H. Bailey, that the proper amount of long-term debt which an industry can safely carry depends on the risk of the business and the stability of earnings. But Hirsch did not agree with Bailey's statement that the earnings of the electric utilities are more stable than the earnings of the Bell Telephone companies. Hirsch stated that the electric utilities operate in competition with the privately-owned generating plants and gas companies; whereas, the telephone industry ordinarily has no competition of any kind. Hirsch's Exhibit No. 20 showed that the three largest electric utilities in the

United States, namely, Pacific Gas and Electric Company, the Commonwealth Edison Company, and Consolidated Edison Company had a composite debt ratio, on December 31, 1955, of 51 per cent. Hirsch's Exhibit No. 21 showed that the capital structures of ten leading electric utilities in the United States as of December 31, 1955, consisted of a composite debt ratio of 51.0 per cent, preferred stock 12.2 per cent, common stock 27.6 per cent, surplus 9.2 per cent. Hirsch's Exhibit No. 22 showed that the composite debt ratio of the three leading electric utilities in the Southern Bell territory, namely, Alabama Power Company, Duke Power Company and Georgia Power Company, on December 31, 1955, was 52.1 per cent; and Hirsch's Exhibit No. 23 showed that the two electric utilities in Mississippi had debt ratios on December 31, 1955, of 52 per cent and 52.5 per cent. Hirsch's Exhibit No. 24 showed that the composite debt ratio of the independent telephone operating companies on December 31, 1955, was 45.9 per cent.

Hirsch stated that there had been a steady decline in the average yields demanded and received by the investors in common stocks during the last five years. In support of that statement Hirsch offered in evidence his Exhibit No. 28, which showed the common stock average yields for the years 1950 to 1955, inclusive, on 200 common stocks, 125 industrials and 24 electric utilities, taken from "1955 Statistical Supplement to the Survey of Current Business", published by the U. S. Department of Commerce and Moody's Stock Survey. The exhibit showed a steady decline in the yields on the 200 common stocks, from 6.27 per cent in 1950 to 4.06 per cent in 1955, a steady decline in the yields on the 125 industrials from 6.51 per cent in 1950 to 3.93 per cent in 1955; and a steady decline in the yields on the 24 electric utilities from 5.66 per cent in 1950 to 4.50 per cent in 1955. Hirsch was of the opinion that, with a 45 per cent debt ratio, the reasonable cost of debt capital to Southern Bell would be 4.2

per cent, and that a reasonable earnings price ratio for Southern Bell common stock would be 6.3 per cent.

Hirsch's Exhibit No. 38 showed that Southern Bell's net average plant in service in its Mississippi intrastate operations, valued at $60,422,358, represented 5.05 per cent of Southern Bell's net average plant in service in its system-wide operations, and that the Mississippi intrastate portion of the Company's entire capitalization was $59,238,937. In his Exhibit No. 39 Hirsch showed an analysis of the results which would be obtained under the existing telephone rates on the basis of an adjusted debt ratio of 45 per cent. If the Company's capital structure were readjusted to provide for a debt ratio of 45 per cent instead of 23.3 per cent the annual net operating income under the rates in effect prior to July 26, 1956, would be $3,005,785, instead of $2,703,785, as shown in Hirsch's Exhibit No. 9. The $302,000 increase in net operating income would result from the reduction in Federal income taxes, due to the payment of debt interest on the amount of the increases in the long-term debt. The rate of return on the $60,422,358 valuation of average plant in service would be 4.96 per cent. The amount of net operating income available for the payment of dividends on the 55 per cent equity capital and surplus would be $2,023,429, and that amount would provide for 6.30 per cent earnings on the common stock, and leave excess net earnings under present rates in the sum of $111,001. The above figures were based on an average interest rate on prevailing debt capital and 4.2 per cent interest on incremental debt capital.

Hirsch's Exhibit No. 40 contained a similar analysis of results which would be obtained under the telephone rates in effect prior to July 26, 1956, if the Company's debt ratio were 50 per cent. The adjusted rate of return on the average plant in service, with a capitalization of 50 per cent common stock and 50 per cent long-term debt, would be 5.08 per cent.

Hirsch stated that his study of Southern Bell's depreciation showed that the Company was charging the highest rate of depreciation which any Bell System Company charged on its property. Hirsch also stated that he had made a comparison of the maintenance expenses of the Company for the test year ending June 30, 1956, and the maintenance expenses for prior years back to 1951. He had found that there was a steady decline in the percentage cost of maintenance expenses from 8.33 per cent of the average telephone plant for the year 1951 to 6.01 per cent for 1954; but there was a sharp upturn to 6.4 per cent for the test year ending June 30, 1956. The increase in percentage cost of maintenance during the test year, over and above the percentage cost of maintenance in 1954, indicated an abnormal maintenance expense of $310,000 in the Company's intrastate operations during the test year. Hirsch then made an adjustment for Federal income taxes and arrived at a figure of $149,000 as the actual amount of the abnormal maintenance expenses charged during the period. Hirsch also suggested other minor normalizing adjustments which, if made effective with a reduction of annual maintenance expenses to 6.01 per cent and a debt ratio of 45 per cent, would produce a rate of return of 5.33 per cent on the rate base of $60,422,358.

W. G. Gilman, a partner in the firm of W. C. Gilman & Company, of New York, was the chief witness called to testify for Southern Bell in rebuttal of the testimony of Arnold Hirsch. Gilman's testimony related mainly to the risks involved in the telephone business as compared with the risks involved in the electric utility business, and a fair rate of return on the common equity capital of Southern Bell. Gilman disagreed entirely with Hirsch's statement . that the electric utility business involved greater risks than the telephone business. Gilman was of the opinion that the telephone business was less stable and was subject to greater risks than the electric busi-

ness for the following reasons: (1) That the telephone industry was more vulnerable in times of business depression than the electric industry; (2) that the labor component in operating expenses of the telephone industry was relatively higher than that of the electric industry; and (3) that there was a wide and continually expanding use for electricity in the home and in the shop and factory, which added to the stability of the electric business, whereas, there was only one service which could be rendered by the telephone industry. Gilman disagreed with Hirsch's statement that if Southern Bell's debt ratio were raised to 45 per cent or 50 per cent it would not affect the quality rating of the Company's bonds. Gilman stated that the market value of the comcon stock of a utility involved in a rate case has nothing whatever to do with the determination of a fair rate of return, which is dependent on a finding of the reasonable value of the property (or the rate base), and the application thereto of a just and reasonable rate which will yield a fair return.

Gilman also disagreed with Hirsch's statement that an earnings ratio of 6.3 per cent or 6.4 per cent on Southern Bell's common stock, including surplus, was adequate. Gilman characterized as completely fallacious and improper Hirsch's theory that, with respect to a utility company whose common stock is traded in the open market, he would use the market price of that stock in determining the earnings requirement in a rate case. Gilman stated that the fact that a parent company invests in the stock of its subsidiary less money than the stock is actually worth has nothing whatever to do with the problem of rate regulation. Gilman concluded that a reasonable earnings rate on the total invested common equity capital of Southern Bell would be between 9.5 per cent and 10 per cent. He stated that his approach would result in a somewhat higher overall return than was found by any other Company witness. Gilman

stated that, even if the market value of Southern Bell stock were $130 a share, as contended by Hirsch, there was nothing wrong or improper in AT&T buying the stock for $100 a share. That was the customary method of financing in such cases. Gilman illustrated this latter point by a reference to AT&T's method of raising equity capital by selling its own stock to its stockholders generally at $100 per share on direct issues, even though the market value of AT&T stock currently was $170 per share. Gilman admitted, however, on cross-examination, that the Pennsylvania Commission, in a recent case involving Metropolitan Edison Company, in which he had testified as a witness on the rate of return, gave consideration to earnings-market price ratios of other utilities' stocks in determining a fair rate of return.

William H. Mounger, Assistant Vice President of Equitable Securities Corporation, also testified for Southern Bell in rebuttal of Hirsch's testimony relating to a fair rate of return. Mounger disagreed entirely with Hirsch's statement that a rate of 6.3 per cent or 6.4 per cent was adequate for Southern Bell as the "earnings requirement to service common stock capital." Mounger stated that Hirsch, by using market price rather than book equity, had arrived at a rate of return far below that actually experienced by the ten leading electric companies mentioned by Hirsch in his Exhibit No. 21. On cross-examination Mounger stated that in making his study he did not go into the debt ratio of Southern Bell, AT&T, or the electric companies.

The Commission in its Opinion and Order made a critical analysis of the testimony of the Company's witnesses relating to the "reasonable value" of its intrastate property in Mississippi. The Commission found that Hatfield's determination of "reasonable value" was based almost entirely on his estimate of the cost of reproducing the existing property at present-day prices of labor and material, less the actual depreciation therein as estimated by Underwood pursuant to Dr. Deming's sampl-

ing procedures. The Commission found that the evidence submitted by the Company on the reasonable value of its intrastate property in Mississippi was conjectural, speculative, unrealistic and unreliable. The Commission noted in its findings that Dr. Deming had visited Mississippi for a total of only two days when he submitted his final sampling instructions; that, although his work was devoted exclusively to sampling procedures for the determination of the "per cent condition" of the Company's property, when asked to explain the meaning of "per cent condition", his answer was, "I don't believe I know"; and that his excuse for not knowing the meaning of "functional depreciation" was that he was "only a statistician". The Commission also noted that under cross-examination Dr. Deming admitted that there were errors inherent in his sampling procedures, to which the human error would have to be added as one man's judgment may vary from pole to pole. As an illustration of the minuscule samples of telephone plants selected for inspection on the basis of Dr. Deming's sampling procedures, the Commission made special mention of the fact that, although Southern Bell owned aerial plant which was attached to approximately 485,000 poles in Mississippi, according to Dr. Deming's testimony only about 1600 of the 485,000 were actually inspected to determine their physical condition and although the Company owned approximately 300,000 telephones in the State, only 900 out of the total number were actually inspected.

In discussing J. C. Underwood's estimate of existing depreciation, which Hatfield adopted in arriving at his estimate of "reasonable value", the Commission made special reference to Underwood's account of the procedures followed in the inspection of a telephone pole, which had to be inspected above the ground line for cracks, splits, woodpecker holes, burns and evidence of leaching, for evidence of external decay. The Commission found that it was apparent that the inspectors need-

ed good eyes to do a creditable job; yet Underwood admitted that he could not see "too good" and he did not know the condition of the inspector's eyes. The Commission noted in its findings that Underwood admitted that the judgment of an inspector might vary from day to day and result in errors of 25 per cent in the per cent condition of poles; that all of the inspectors were Company employees, and all knew that the results of their inspection were to be used in connection with the rate hearing. The Commission found that Hatfield, in computing his cost of reproduction, did not envisage a modern, efficient and economical telephone plant which would reflect the improvements in plant equipment and materials described by the witness Porter as he enumerated the advtanges which the Company received under the License Contract with AT&T, but a plant identical with that which existed at the time of the hearing, including obsolete and outmoded facilities, such as manual central office equipment and antequated telephone sets, many of which were no longer being manufactured. The Commission stated that it did not wish to belabor the palpable infirmities in the testimony of Dr. Deming and Mr. Underwood, and that the Commission could give little weight to the proofs adduced by Mr. Hatfield.

The Commission found that based on Southern Bell's books and records, the Company's net average investment in its intrastate property in Mississippi during the test year comprised the following items:

| | Average |
| --- | --- |
| Telephone Plant in Service | $75,400,705 |
| Telephone Plant Under Construction | 1,497,822 |
| Property Held for Future Tele. Use | 145,687 |
| Materials and Supplies | 899,132 |
| Cash Requirements | 156,068 |
| Total Gross Investment | $78,099,414 |
| Depreciation Reserve | 14,978,247 |
| Net Investment | $63,121,067 |

The Commission found, however, that, under the facts in this case, the items listed as telephone plant under construction, materials and supplies and cash requirements should be excluded from the rate base. The Commission found that the item listed as "Telephone Plant under Construction, $1,497,822", should be excluded from the rate base for the reason that, under the uniform system of accounts for Class A and Class B telephone companies, as prescribed by the Federal Communications Commission, when such construction work is completed and the new plant goes into service, its total cost, including interest (at 5 per cent for Southern Bell), taxes and other overhead expenditures, is capitalized, and the Company would therefore suffer no injury from the exclusion of such item from the rate base. The Commission also found that a substantial portion of the plant under construction was designed for new customers and for the upgrading of present subscribers, and the Company had offered no evidence to show the amount of anticipated revenue to be derived from the new construction. If therefore plant under construction were included in the rate base, the existing telephone users would be forced to pay a return on property constructed for future subscribers, with the result that, when these future subscribers began to receive the new or upgraded service, the Company would derive a double return on the cost of such construction.

The Commission also found that the items listed above as "Materials and Supplies, $899,132" and "Cash Requirements, $156,068", should be excluded from the rate base. In discussing these items the Commission said:

"We do not think that Materials and Supplies ($899,132) or Cash Requirements ($156,068), both aggregating $1,055,200, should be included in the rate base in this proceeding. The record shows that Southern Bell accrues a substantial sum of money for Federal income, State income, property, gross

receipts and miscellaneous taxes in advance of their due dates, and thereby enjoys the use and benefit thereof in its business. The telephone subscribers contribute this money through their monthly bills. During the 12 months ended June 30, 1956, the test period, there was an average monthly balance in the accrued reserve of $1,613,750 for the payment of Federal income taxes, $311,560 for the payment of State income taxes, $741,300 for the payment of property taxes, and $153,870 for the payment of gross receipts and miscellaneous taxes, or an aggregate monthly balance of $2,820,480. In addition, the company enjoyed the benefit of certain operating revenues which were subject to advance billing and averaged $1,360,200 each month during the test period. If the tax accruals alone are considered, it is apparent that the telephone subscribers have thus made an advance contribution of more than 2.5 times the company's total working capital rerequirements of $1,055,200. As a consequence, if these subscribers were obliged to pay a return on this working capital, it would be tantamount to a return on funds which they themselves supplied. And it would constitute unjust enrichment to Southern Bell.''

The Commission cited in support of its action in excluding from the rate base the two items last above mentioned a decision of the Federal Power Commission in the very recent case of Trunkline Gas Company decided April 24, 1956, in which the Federal Power Commission said:

"It is our policy that amounts charged to customers each month to cover the annual income tax allowance and retained by the selling company prior to payment to the Federal Government should be credited against working capital. * * * Working capital, as an item in the rate base upon which

Trunkline is permitted a return, represents the capital supplied by investors. However, when funds available for working capital are supplied by ratepayers and result from the annual lag in income tax payments, Trunkline has available to it funds which offset capital requirements otherwise to be supplied by investors. To the extent income tax accruals are available from the ratepayers, it is inequitable to require them to pay a return upon working capital.'' F. P. C., Docket No. G-9034, Apr. 24, 1956.

By excluding plant under construction, materials and supplies, and cash requirements from the net investment of $63,121,067, the Commission found that Southern Bell's net average investment during the test period was $60,568,045. The Commission found that the figure of $60,568,045 was the only rate base supported by competent and reliable evidence; and the Commission accepted that figure as the ''reasonable value'' of the Company's Mississippi intrastate properties during the test period for rate-making purposes.

The Commission found that the evidence submitted by the Company showed that, after adjustments had been made to reflect the full annualized impact of the wage increases which became effective May 20, 1956, the net operating income of the Company during the test period, was $2,703,785; and with a rate base of $60,568,045 and a net operating income of $2,703,785, the Commission found that the rate of return received by the Company was 4.46 per cent. In discussing that figure the Commission in its Opinion and Order said:

''If we divide the company's purported net operating income of $2,703,785 during the test period by the rate base of $60,568,045 which we have found, the result is a rate of return of 4.46%. But such a figure is meaningless when viewed by itself. It does not imply that the telephone rates are just and

reasonable, or excessive, or inadequate. It must be subjected to well-recognized tests before we can determine its true significance. * * *.

"It is manifest that with an established rate base, as here, the rate of return is a function of the net operating income. Thus, if the net operating income is fair and reasonable, it would follow, as a corollary, that the rate of return is fair and reasonable, whatever the percentage. In Federal Power Commission v. Hope Natural Gas Co. (1944), 320 U. S. 591, 51 PUR (NS) 193, the United States Supreme Court said: 'Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid even though they might produce only a meager return on the so-called "fair value" rate base.' "

The Commission stated in its Opinion and Order that "every public utility is under a legal obligation to conduct its operation in an efficient and economical manner."

The Commission found that the amount of Southern Bell's net operating income would have been greater during the test period if it had not reduced its debt ratio in an imprudent and uneconomical manner during the postwar period, thereby making the capitalization top heavy with common stock for the benefit of the American Telephone & Telegraph Company. In discussing that phase of the case, the Commission said:

"During the test period, Southern Bell's capital structure appears to have been imprudent and uneconomical by reason of having an abnormally low amount of debt, the effect of which was to distort the true rate of return earned by the company under the rates prevailing during that period.

"The composition of a utility's capital structure affects its operating costs and earnings requirement, particularly under the current level of Federal income taxes. A prudent capital structure is one conducive to the lowest cost of service that is consistent with a sound financial posture.

"The record shows that Southern Bell's debt ratio, or the percentage of long-term debt in its total capitalization, had declined from 45.8% at the end of 1947 to 22.3% at December 31, 1955. During the test period, the debt ratio averaged 21.7%. While the company's debt ratio was thus declining, the debt ratios of the privately-owned electric utilities in the United States rose from 46.8% (composite) at the end of 1947 to 50.4% at December 31, 1954, and that of the natural gas companies advanced from 50.8% to 61.8% during the period (Hirsch Exhs. 14,19). Moreover, at December 31, 1954, the privately-owned electric utilities has a composite of 12.4% of preferred stock in their capital structures and the natural gas companies 7.8%; but Southern Bell's capitalization is, without any preferred stock, an admittedly lower cost security than common stock. And during 1955, of all the new money securities issued by the electric and gas utilities, long-term debt constituted 59.5% and 71.6%, respectively, and preferred stock represented 15.5% and 9.4%, respectively. Between January 1 and June 30, 1956, these electric and gas utilities continued to obtain most of their new money requirements through the issuance of relatively low-cost debt securities instead of the much higher priced common stock capital. During this latter period, these utilities issued 63.9% and 77.9%, respectively, of long-term debt, in addition to 15.4% and 16.9%, respectively, of preferred stock (Hirsch Exh. 18). It is manifest that while the management of the electric and gas utili-

ties have been seeking to reduce their overall cost of capital, a policy which benefits the ratepayers, the management of Southern Bell has been steadily increasing its overall cost of capital."

"* * *."

"From the standpoint of risk and stability of earnings, we are of the opinion that Southern Bell can safely carry as much long-term debt as is characteristic of the electric utility industry.

"We think the evidence in the record explains why Southern Bell's capitalization is top-heavy with common stock equity. Under the License Contract, the American Telephone and Telegraph Company, which owns 100% of Southern Bell's common stock and can therefore dictate its capital structure, is obligated to provide the 'necessary financial support and assistance' for its subsidiary's needs. By furnishing such assistance through investments in Southern Bell's common stock instead of bonds, the American Company thereby receives a 4 times greater net return (Hirsch Exh. 26). As Southern Bell is included in its parent's consolidated Federal income tax returns, the American Company is completely exempt from the payment of any taxes on the common stock dividends it receives from Southern Bell. The relationship of the companies thus enables the A. T. & T. to derive huge profits at the expense of its subsidiary and the telephone subscribers."

The Commission found that Southern Bell's capital structure during the test period, with an average debt ratio of 21.7 per cent, was imprudent and uneconomical, and imposed an unjust and unwarranted financial burden on the telephone subscribers; and for the purpose of assessing the justness and reasonableness of the Company's rates during the test period, the Commission adopted a debt ratio in the range of 45 to 50 per

cent, which the Commission believed was fair and equitable. The Commission found in the light of the testimony of the Company's witness Bailey, Langum and Johnson, and the witness Hirsch, that a fair and reasonable composite cost of debt capital to Southern Bell would be between 3.59 per cent and 3.72 per cent with the debt ratios of 45 per cent and 50 per cent, respectively.

The Commission found that, since all of Southern Bell's common stock was owned by AT&T and none of the stock could be purchased on the open market, there was no direct way of appraising its investment quality; and the Commission was obliged to look elsewhere for guidance as to the reasonable cost of equity capital for the Company. The Commission found, however, that there was little doubt that if Southern Bell's common stock were available for purchase on the open market, it would rank easily with the first electric utility securities; that the record showed that during the five-year period from 1951 to 1955 the average yields on the first quality common stock in the electric industry had declined from 5.80 per cent to 4.46 per cent; and that the decline in average yields was not a phenomenon of the electric industry alone. The Commission was of the opinion that, with a prudent capital structure, the reasonable earnings price ratio on the common stock of Southern Bell would range between 6.3 per cent and 6.4 per cent; and that under efficient and economical management this range of earnings price ratios would compensate Southern Bell investors (AT&T) with earnings commensurate with the earnings currently realized by the investors in reasonably comparable utilities, and would provide for adequate common stock dividends and surplus.

The Commission incorporated in its Opinion and Order a pro forma statement of Southern Bell's intrastate capitalization under assumed debt ratios of 45

per cent and 50 per cent for rate-making purposes, and an analysis of Southern Bell's earnings under the intrastate telephone rates which were in effect during the test period, based on the current cost of debt and equity capital and the range of debt ratios which the Commission found to be fair and reasonable. The analysis showed that an increase in Southern Bell's debt ratio to 45 per cent would result in a reduction of $302,000 in the Company's Federal income taxes (based on the present corporate rate of 52 per cent), and a corresponding increase in the Company's net operating income to $3,005,785, which was sufficient, after the payment of all interest obligations, to compensate the owner of the common stock on the basis of an earnings price ratio of 6.30 per cent, and to provide a cushion of $111,001 in excess of such compensation, or the equivalent of $258,000 in excess operating revenue. The Commission also pointed out in its opinion and findings that, if the above mentioned net operating income of $3,005,785 were divided by the rate base of $60,568,045, it would produce a rate of return of 4.96 per cent. In the same manner it was also shown that, with a 50 per cent debt ratio, the rate of return on the above mentioned rate base would be 5.08 per cent, and the excess earnings over dividend payments would be $202,713, or the equivalent of $471,000 in excess operating revenue.

The Commission also found that between 1951 and 1954 there was a steady decline in the Southern Bell's unit maintenance costs (measured by the ratio of maintenance expenses to average telephone plant in service), from 8.33 per cent in 1951 to 6.01 per cent in 1954; that the Company's normal operations were disrupted by a 72-day strike in March, April and May 1955; and that during the test period beginning July 1, 1955, shortly after the strike, the ratio of maintenance costs rose from 6.01 per cent to 6.40 per cent. The Commission stated that the evidence indicated strongly that the

increase in the Company's maintenance costs during the test period was a result of the strike. The estimated amount of the excess in maintenance expenditures incurred during the test period was $310,000, or $149,00C after deducting Federal income taxes. The Commission also found that the Company's statement of operating expenses during the test period included an item of $91,-000 covering extra costs incurred in preparation for the rate case hearing, which was a non-recurring item of expense. The Commission found that, if the abnormal maintenance costs and rate case expenses incurred during the test period were excluded from the calculation of net earnings, the rate of return on the reasonable value of the Company's property would be increased to 5.28 per cent based on a debt ratio of 45 per cent and to 5.40 per cent based on a debt ratio of 50 per cent, and the earnings price ratio enjoyed by the owner of the common stock would be raised to a range of from 7.50 per cent to 7.85 per cent.

After reviewing the evidence and making the special findings indicated above, the Commission found that the Company's rates which pervailed during the test period were just and reasonable, and that the higher rates made effective by the Company under bond on July 26, 1956, were materially excessive, unjust and unreasonable, and, therefore, unlawful. The Commission also found that the Company had failed to meet the burden of proof to show that, in the light of well-established principles of rate-making, the intrastate rates and charges which prevailed in Mississippi during the test period were unjust, unreasonable, or confiscatory. The Commission therefore ordered that the tariff of intrastate rates and charges filed by the Company on June 25, 1956, and made effective under bond on July 26, 1956, be set aside and annulled, and that the Company make effective forthwith the tariff of intrastate rates and charges which were in effect on July 25, 1956.

The appellant's attorneys argue two basic issues on this appeal:

1. Section 7716-08, Code of 1942, Recompiled, specifically provides that rates prescribed by the Commission to be charged by a utility for its services shall be such as to yield to the utility a fair rate of return upon the reasonable value of the property of the utility used or useful in furnishing such service; that the statutes clearly contemplates and provides that the Commission shall ascertain and fix a rate base, which shall be the reasonable value of the property of the utility used and useful in furnishing service; that the Commission in its order fixing the rates to be charged by the appellant has deliberately and arbitrarily failed and refused to follow the method of rate-making provided by the statute, and has adopted in lieu of that method a hybrid theory of rate-making recommended by the witness Hirsch; and that the Commission's order is therefore null and void, and should be vacated and set aside.

2. That the rate of return which the Commission prescribed in its order does not constitute the fair rate of return upon the reasonable value of the Company's intrastate property which is specifically required by Section 7716-08, Code of 1942, Recompiled, and does not satisfy the requirements of the due process of the State and Federal constitutions.

In their argument on Basic Issue No. 1, mentioned above, the appellant's attorneys say that the $60,368,045 referred to in the Commission's Opinion and Order as a rate base does not in any sense represent the reasonable value of the Company's property during the test period, and that the Commission's action in adopting that figure as a rate base was arbitrary and constituted a direct violation of the Mississippi statute. The appellant's attorneys say that the testimony of the witness Hatfield, supplemented by that of Underwood and Deming, was sufficient to establish with a reasonable

degree of certainty the reproduction cost new of the property, less actual physical and functional depreciation; and that the Commission should have accepted Hatfield's estimate of $72,000,000 as the reasonable value of the property during the test period. The appellant's attorneys also say that there was no testimony offered by the Commission to dispute the Company's evidence of the reasonable value of the property. It is also contended that the Commission erred in using depreciated original cost, or net investment in determining the reasonable value of the appellant's property and in giving no weight to the evidence offered on behalf of the appellant to show the increased cost of labor and materials which would be required to reproduce the plant under present-day. conditions. It is contended that the failure of the Commission to give such weight to increased price levels at the present time has resulted in the taking of its property for public use without just compensation.

 In our opinion those contentions are without merit. Our statute does not bind the Commission to the use of any particular formula in determining the reasonable value of the property of a public utility for rate-making purposes. Our statute merely provides that the rates prescribed shall be such as to yield a fair rate of return upon the reasonable value of the property used and useful in furnishing service, and that, the Commission in arriving at such rate base "shall give due consideration to all elements that are generally considered in determining the rate base for rate-making purposes." There are a number of formulas which are useful in the determination of the reasonable value of a utility's property for rate-making purposes. No public utility has a vested right to any particular method of valuation. City of Fort Smith v. Southwestern Bell Telephone Company (1952), 220 Ark. 70, 247 S. W. 2d 474.

In Public Service Coordinated Transport v. State (1950), 5 N. J. 196, 217-218, 74 A. 2d 580, 591, Chief Justice Vanderbilt, speaking for the Court, said:

"There are a number of formulae useful in the determination of fair value: depreciated original cost, depreciated prudent investment, reproduction cost of the property less depreciation, cost of reproducing the service as distinct from the property, and there are undoubtedly others. But the Board is not bound to and, indeed, should not use any single formula or combination of formulae in arriving at a proper rate base for the determination of fair value is not controlled by arbitrary rules or formulae, but should reflect the reasonable judgment of the Board based upon all the relevant facts. Atlantic City Sewerage Company v. Board of Public Utility Commissioners, 128 N. J. L. 359, 26 A. 2d 71 (Sup. Ct. 1942), affirmed 129 N. J. L. 401, 29 A. 2d 850 (E. & A. 1943)."

For more than sixty years a controversy over what should constitute the rate base of a public utility has filled the books with conflicting decisions. One theory holds that the reconstruction cost new less actual depreciation is the proper rate base. This theory originated in Smyth v. Ames (1898), 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819. The other theory holds that the owners of the utility are only entitled to protect their investment in the utility and that the original cost of the plant less book depreciation is the proper foundation for a rate base.

In Smyth v. Ames, supra, the Court said:

"We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the

original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth.''

It is now generally agreed that Smyth v. Ames produced the reconstruction cost new doctrine because at that time the books and records of the utilities did not accurately reflect the cost of the properties. A reading of the prevailing and dissenting opinions of the Supreme Court from the time of Smyth v. Ames to the present day will demonstrate that the above quoted rule did not create certainty in the fixing of rates by public utility commissions. But the rule prescribed by the highest judicial authority was binding upon regulatory bodies and the lower courts until its final rejection by the Supreme Court itself in the Hope Natural Gas Company case in 1944.

In the Minnesota Rate cases, Simpson v. Shephard (1913), 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A., N. S. 1151, ANN. Cas. 1916A, 18, the Court reaffirmed the doctrine of Smyth v. Ames regarding the right of a company to earn a fair return upon the reasonable value of the property at the time it is being used for the public. The importance of the decision in

that case lies in the rejection by the court of the attempt to apply the cost-of-reproduction method to valuation of the land. Immediately following the end of the first World War, state commissions were urged to make allowances in the determination of the rate base for the inflationary price levels then existing and the increased value of properties acquired at lower price levels during the prewar period. These requests were not always granted. The effect of the inflationary price levels and the failure of the state commissions to accord weight to the greatly increased costs of materials, labor and supplies over the cost prevailing during the prewar period were discussed by the court in Galveston Elec. Co. v. Galveston (1922), 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678, and in Southwestern Bell Telephone Co. v. Public Service Commission (1923), 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; and the effects of increased prices and increased labor costs on the fair value of the utility's property were enlarged upon by the court in the majority opinion in the case of McCardle v. Indianapolis Water Company, 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316 (Brandeis and Stone dissenting). In the majority opinion in that case the court said: ''But in determining present value, consideration must be given to prices and wages prevailing at the time of the investigation; and, in the light of all the circumstances, there must be an honest and intelligent forecast as to the probable price and wage levels during a reasonable period in the immediate future. In every confiscation case, the future as well as the present must be regarded. * * *.'' Page 408, of 272 U. S., page 147 of 47 S. Ct., 71 L. Ed. 316.

It was in the Southwestern Bell Telephone Company case that Justice Brandeis rendered his now famous concurring opinion in which he concurred in the result reached by the majority, but dissented from the ''fair value'' doctrine of Smyth v. Ames and urged the Court

to adopt as the standard for measuring the reasonableness of rates the so-called "prudent investment" rule. In McCardle v. Indianapolis Water Company case, Justice Brandeis again wrote a dissenting opinion in which he severely criticized the "spot" reproduction cost theory laid down in the majority opinion in that case.

The insistence of the Court upon the treatment of evidence of reproduction cost new as a dominant factor in the determination of the rate base reached its peak in the Southwestern Bell Telephone Company case and the McCardle case. After the rendition of the decisions in those cases, an unmistakable trend developed away from the fair value, reproduction cost new, rate base doctrine of Smyth v. Ames. In Los Angeles Gas & Electric Corporation v. Railroad Commission of California (1933), 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180, and in Railroad Commission v. Pacific Gas and Electric Co. (1938), 302 U. S. 388, 58 S. Ct. 334, 82 L. Ed. 319, the Supreme Court held that procedural due process as distinguished from substantive due process did not require the use of fair value.

In the case of Railroad Commission v. Pacific Gas and Electric Co., supra, the Court said:

"There is no principle of due process which requires the rate making body to base its decision as to value, or anything else, upon conjectural and unsatisfactory estimates. We have had frequent occasion to reject such estimates. Minnesota Rate Case, 230 U. S. 352, 452; Los Angeles Gas Co. v. Railroad Commission, supra, (289 U. S. 287), pp. 307, 310, 311; Lindheimer v. Illinois Bell Telephone Co., 292 U. S. 151, 163, 164. * * *

"* * *

"While the Court has frequently declared that 'in order to determine present value, the cost of reproducing the property is a relevant fact which should have appropriate consideration,' we have

been careful to point out that 'the Court has not decided that the cost of reproduction furnishes an exclusive test' and in that relation we have 'emphasized the danger in resting conclusions upon estimates of a conjectural character.' Los Angeles Gas Co. v. Railroad Commission, supra, p. 307. And in the Los Angeles case, with the evidence before us which had been taken by the Commission and by the District Court, we held that on that evidence it did not appear to be 'unfair to the Company in fixing rates for the future, to take the historical cost as found by the Commission as evidence of the value of the Company's structural property at the time of the rate order.' Id., p. 309. In the instant case we cannot say that the Commission in taking historical cost as the rate base was making a finding without evidence and therefore arbitrary.''

In Federal Power Commission v. Natural Gas Pipeline Company (1942), 315 U. S. 575, 586, 62 S. Ct. 736, 86 L. Ed. 1037, the Court held that the Constitution does not bind ratemaking bodies to the service of any single formula or combination of formulas, and in its opinion in that case the Court said:

''Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end.''

■■ Finally, in the case of Federal Power Commission v. Hope Natural Gas Company (1944), 320 U. S. 591, 64 S. Ct. 281, 88 L. Ed. 335, the Court radically altered the course of utility regulation by holding that, under the statutory standard of ''just and reasonable,'' it is the end result reached, not the method employed which is controlling, and that the Commission could constitutionally use an original cost rate base. The Court in its opinion in that case said: ''It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.'' The effect of the decision in the Hope case was to free the state commissions as far as the Federal Constitution was concerned from any restriction in their choice of a rate base. Many state courts and commissions turned from fair value to original cost, although elsewhere fair value continued as the accepted rate base, not because of Federal constitutional requirements but because of state law.

The appellant's attorneys admit that the effect of the decision in the Hope Natural Gas Company case, supra, was to free state commissions so far as the Federal Constitution is concerned from any restrictions in their choice of a rate base. But the appellant's attorneys say that there is nothing whatever in the decision in the Hope case, or in the Federal Constitution, which prevents the state legislature from prescribing ''reasonable value'' as the rate base for use in fixing just

and reasonable rates for intrastate operations of a utility in such state; that the fixing of rates is generally accomplished by a standardized procedure, which requires the use of a rate base, and that no other method can be followed in jurisdictions having a statutory rate base; that the Mississippi Legislature, by the enactment of Chapter 372, Laws of 1956, aligned itself with those statutes which had adopted the "fair value" method of rate regulation laid down in Smyth v. Ames for rate-making purposes; and that it was the duty of the Commission to apply that method in this case. The appellant's attorneys say that the term "reasonable value" as used in the Mississippi statute means "fair value," as defined by the Supreme Court in Smyth v. Ames and later decisions of the Supreme Court rendered prior to the decision in the Hope Natural Gas Company case. The appellant's attorneys do not say that our statute requires that controlling effect be given to the Company's opinion evidence as to reproduction cost. But it is clear from the argument made in the appellant's brief that the appellant's principal ground of complaint on this point is that the Commission failed to give probative value to Hatfield's estimate of reproduction cost new and accept Hatfield's estimate of "reasonable value" of the Company's intrastate property as a rate base.

The appellant's attorneys cite, in support of their contention that the Commission erred in adopting original cost less depreciation as a rate base, several cases in which the courts have held since the decision in the Hope Natural Gas Company case that the "fair value" rule, as stated in Smyth v. Ames, supra, must still be applied in rate-making cases, notwithstanding the fact that the rule is no longer regarded by the Supreme Court as a part of the due process requirement of the Federal Constitution. Among the cases cited are: City of Cleveland v. Public Utilities Commission (Ohio 1956), 132

N. E. 2d 216; Application of Diamond State Telephone Company (Del. 1954), 103 A. 2d 304 and 113 A. 2d 437 (Del. 1955), modifying on reargument 107 A. 2d 786; State Ex rel. Utilities Commission v. Southern Bell Telephone & Telegraph Company (N. C. 1954), 80 S. E. 2d 113; Alabama Public Service Com. v. Southern Bell Tel. & Tel. Co. (Ala. 1958), 106 So. 2d 163. But each of those cases was decided under a statute which expressly provided that reproduction cost should be considered in determining the value of the property. The decision of the Court in City of Cleveland v. Public Utilities Commission, supra, was controlled by the Ohio statute which requires the Commission to use reproduction cost less depreciation as the rate base in utility rate-making cases. Sec. 499-9, Ohio General Code Ann. The decisions in the Diamond State Telephone Company case, supra, were controlled by the Delaware statute, Title 26, Sec. 126, Del. C. 1953, which, as the Court pointed out in its opinion, "follows practically verbatim the famous dictum from Smyth v. Ames, elsewhere cited, which fathered the so-called fair value doctrine." The Delaware statute provides that the Commission, in ascertaining and determining the fair value of the property, may take into consideration, among other things, "the reproduction costs of the property, based upon the fair average price of materials, property and labor."

The North Carolina case of Utilities Commission v. Southern Bell Telephone & Telegraph Company (1954), supra, was decided under a statute which provides that the Commission in determining the value of the property being used for the convenience of the public, shall consider "the present compared with the original cost of construction." The case of Alabama Public Service Commission v. Southern Bell Telephone & Telegraph Co., supra, was decided under a statute which provides that the Commission, in arriving at a valuation of the property of any utility, "shall give due consideration

to the history and development of the utility and its property, original cost, cost of reproduction, as a going concern, and other elements of value recognized by the laws of the land for rate-making purposes.'' The appellant's attorneys also cite cases from several other states in which the courts have held that the evidence of reproduction cost new must be considered and given proper weight by the commission in rate-making cases. But these cases are cases in which the courts have merely followed the rules laid down in earlier cases decided by the same court prior to the decision in the Hope Natural Gas Company case.

■■ ■ We think it is clear, however, that the Mississippi Legislature, by the enactment of Chapter 372, Laws of 1956, did not intend to impose upon the Commission a requirement that the so-called ''fair value'' formula laid down in Smyth v. Ames, with its emphasis upon reproduction cost new, be adopted as a measure of value, in determining the reasonable value of the utility's property for rate-making purposes. Obviously the statute contains no such requirement; and the language used in the statute negatives the idea that the Legislature intended to bind the Commission to the use of any such formula. We do not consider that the statutory requirement that rates shall be ''just and reasonable,'' and shall be such as to yield a fair rate of return to the utility furnishing service, upon the ''reasonable value'' of the property of the utility used or useful in furnishing service, was an enactment into law of the ''fair value'' rule of Smyth v. Ames, supra. The ''fair value'' rule laid down in Smyth v. Ames had been definitely discarded by the Supreme Court 12 years before the Mississippi statute was enacted, and the term ''fair value'' is not used in the statute.

■■ ■ We do not hold that evidence of reproduction cost new less depreciation should not be admitted in a hearing on a rate case; but if such evidence is admitted,

its probative value must be determined by the Commission. ■■ The Commission is not required to accept the opinion evidence of the Company's witnesses blindly. Such evidence is to be weighed by the Commission and judged in the same manner as other opinion evidence. The Supreme Court, as we have seen above, has emphasized the danger in resting conclusions upon estimates of a conjectural character.

The Commission in this case admitted the opinion evidence offered on behalf of the appellant and after considering the same found that the evidence was conjectural, speculative, unrealistic and unreliable, and the evidence was for that reason rejected.

The appellant's attorneys severely criticize the Commission's action in rejecting the opinion evidence of the Company's witnesses Hatifeld and Underwood relating to the ''present value'' of the Company's property. The appellant's attorneys say that the Company presented clear and convincing evidence that the present cost of reconstructing the Company's plant would greatly exceed the original cost; that only minor items of the evidence have been severely criticized; and that the Commission's action in rejecting all of Hatfield's and Underwood's testimony as to the ''present value'' of the property was arbitrary and unlawful.

■■ But we find nothing in the record to indicate that the Commission's action in rejecting the opinion evidence of Hatfield and Underwood as to the ''present value'' of the property was either arbitrary or unlawful. The Commission is the trier of the facts in a rate case; and in its consideration of the various elements that are generally considered in determining the rate base, it is within the province of the Commission to determine the weight to be given to the evidence, the reliability of the estimates and opinions, and the credibility of the witnesses. There is nothing in the law that compels the Commission to accept the opinion evidence of the

Company's employees as proof of the reasonable value of the Company's property for rate-making purposes, if, in the opinion of the Commission, that evidence is conjectural, unrealistic and unreliable.

The inherent weakness of estimates and opinion evidence as to the cost of reproduction of plant in service in cases of this kind have been considered by regulatory agencies and by the courts in many cases during the last ten years, and such evidence has often been rejected for the same reason that such evidence was rejected by the Commission in this case.

In the case of Chesapeake and Potomac Telephone Company v. Public Service Commission (1952), 201 Md. 170, 93 A. 2d 249, the Court discussed at length the so-called "fair value" rule, which had been applied by the Maryland Court in cases previously decided and which the appellant insisted should be applied in the instant case; and the Court in its opinion said:

> "The appellant has cited no case, however, holding that in determining fair value any particular formula must be adopted, or that controlling effect must be given to reproduction cost, as compared to original cost. In its brief it is stated that the principal ground on which it relies is 'the Commission's failure to give adequate weight to reproduction cost.' The cases of McCardle v. Indianapolis Water Co., 272 U. S. 400, 408, 47 S. Ct. 144, 71 L. Ed. 316, and Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U. S. 287, 305, S. Ct. 637, 77 L. Ed. 1180, relied upon by the appellant, both indicate that the determination of value is not a matter of formula, although consideration must be given to reproduction cost. In some cases, courts have expressed a preference for reproduction cost. City of Marietta v. Public Utilities Commission, 1947, 148 Ohio St. 173, 74 N. E. 2d 74, 79. In others it has been said that 'the determination of fair value

is not controlled by arbitrary rules or formulae, but should reflect the reasonable judgment of the Board based upon all the relevant facts.' In re New Jersey Power & Light Co., 1952, 9 N. J. 498, 89 A. 2d 26, 32. In that case the court affirmed the action of the Commission in rejecting as of insufficient weight all of the evidence as to present value.

''* * *

''Estimates of reproduction cost are conjectural at best, not merely because they rest on opinion, but for the obvious reason that probably no plant would ever be reproduced in its present form. Even the physical structures to replace the old would be designed, so far as possible, to compensate in efficiency and convenience for the higher construction costs. Cf. Schreiber v. Pacific Coast Fire Insurance Co., Md., 75 A. 2d 108, 111, 20 A. L. R. 2d 951. In regard to plant equipment, the increased cost of reproduction would likewise be measurably offset by the technological improvements constantly discovered and introduced to meet the rising costs of labor and materials. One result is that equipment becomes obsolete before it wears out. The fact that evidence as to a substitute plant has been held irrelevant, McCardle v. Indianapolis Water Co., supra, does not mean that the Commission must close its eyes to the obvious in weighing evidence of reproduction cost.

''* * *

''The inherent weaknesses in estimates of this character have been fully recognized by the courts. See Georgia Railway & Power Co. v. Railroad Commission, 262 U. S. 625, 629, 43 S. Ct. 680, 67 L. Ed. 1144; Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180; Railroad Commission v. Pacific Gas & Electric Co., 302 U. S. 388, 58 S. Ct. 334, 82 L. Ed.

319; In Re New Jersey Power & Light Co. (New Jersey Power & Light Co. v. State), supra; New England Telephone & Telegraph Co. v. State, 95 N. H. 353, 64 A. 2d 9. In these cases estimates of reproduction cost were totally rejected. In the instant case it is indisputable that the Commission did give weight to the estimates of reproduction cost, to the extent of over $3,000,000 above the Company's original cost.''

In New Jersey Bell Tel. Co. v. Department of Public Utilities (1953), 12 N. J. 568, 97 A. 2d 602, the Court held that where a public utility seeks a rate increase, the Board of Public Utility Commissioners must determine the rate base at the fair value of the utility's property that is used and in service, by reviewing the plant as an integral and unitary whole, considering all elements properly entering into the ascertainment of a reasonable return for supplying the public need, but the rate base need not be coupled directly to the cost of living indices or current cost in material and labor markets. In its opinion in that case the Court said:

''(1) Formulae.

''The Company contends that the Board completely ignored the allegedly substantial evidence introduced at the hearings in relation to reproduction cost of its plant. It appears from the record that the Company introduced evidence as to its average net investment (an historical cost rate base), as to cost of reproduction less existing depreciation (a reproduction cost new rate base), and expert testimony as to present fair value. The Board determined that the evidence indicated that the expert gave cost of reproduction a weighting of approximately ⅔ and actual (historical) cost a weighting of ⅓ in arriving at his opinion of fair value.

''It is necessary only to reiterate that the settled law of this State is that there was a number

of formulae useful in determination of fair value of a utility's property for use as a rate base and that the Board is not and should not be bound by any simple formula or combination of formulae. Public Service Coordinated Transport v. State, supra, 5 N. J. at page 217, 74 A. 2d 580; In Re New Jersey Power & Light Co., supra, 9 N. J. at page 510, 89 A. 2d 26. It follows that the Board's determination may not be set aside merely because it did not fully adopt any one of the specific formulae used by the Company in presenting its evidence on rate base.

"(2) The Burden of Proof.

"It is now firmly established that the statutory and decisional law in this State requires the utility to bear the burden of proving the reasonableness of proposed rate increases. * * * The Company recognizes this but contends that the Board completely disregarded all its evidence of reproduction cost with its attendant proofs as to current economic conditions.

"(3) Reproduction Cost Evidence.

"It is true that the Board must determine the rate base at the fair value of the property of the public utility that is used and useful in the public service at the time of its employment therein, by viewing the plant as an integral and unitary whole, considering all the elements properly entering into the ascertainment of a reasonable return for supplying the public need. In Re New Jersey Power & Light Co., supra, 9 N. J. at page 509, 89 A. 2d 26; Public Service Coordinated Transport v. State, supra, 5 N. J. at page 217, 74 A. 2d 580; Atlantic City Sewerage Company v. Board of Public Utility Com'rs., supra, 128 N. J. L. at pages 365, 366, 26 A. 2d 71. However, there is no requirement that the rate base be coupled directly to cost of living indices or cur-

rent costs in material and labor markets. The pertinent standards in this respect have been detailed by this court in the matter of In re New Jersey Power & Light Co., supra, 9 N. J. at pages 516-517, 89 A. 2d 26. It is evident from the record that at the time of the rate decision in the present case over 60% of the Company's gross plant investment had been made during the period 1946-1951 and therefore reflected post-war price and labor levels. Cf. In Re New Jersey Power & Light Co., supra, 9 N. J. at page 524, 89 A. 2d 26. While this is not a controlling feature it is a factor which was properly considered by the Board.

"Cost of reproduction is a guide, but not a measure. Dayton P. & L. Co. v. Public Utilities Commission, 292 U. S. 290, 311, 54 S. Ct. 647, 78 L. Ed. 1267, 1281 (1934)."

In the case of Southwestern Bell Tel. Co. v. State (1951), 204 Okla. 225, 230 P. 2d 260, the Court held that a public utility is entitled to such rates as will enable it to earn a return upon its invested capital employed in the public service sufficient to maintain and support its credits so that it may raise the money necessary to improve and expand its services, and to assure the confidence of prospective investors in its financial soundness. In its opinion in that case, the Court said:

"The Company urges that the rate base fixed by the Commission was improper and that it is entitled to a rate upon the fair value of its property. We are unable to agree with this contention. In Lone Star Gas Co. v. Corporation Commission, 170 Okl. 292, 39 P. 2d 547, we said that there was more than one theory or formula which might be adopted and followed by rate-making bodies, and that none was exclusive or more favored than the others."

The appellant in this case, introduced evidence at the beginning of the hearing as to the value

of the Company's property in two categories, one of which was evidence relating to the original cost of the property less the depreciation reserve, as shown by the books of the Company, or net investment, and the other being Hatfield's evidence as to "present value" based primarily upon estimates of reproduction cost new less estimated depreciation. The finding of the Commission that the Company's evidence as to "present value," based on Hatfield's estimates of reproduction cost new less depreciation, was conjectural, speculative, unrealistic and unreliable, and that such evidence could be given no weight in the determination of a rate base, did not render the Commission's decision and order invalid. The Commission had before it the Company's evidence of original cost less the depreciation reserve, which was competent and relevant evidence and material in the determination of the issue as to "reasonable value." The Commission also had before it the testimony of the Company's Assistant Vice President Groce, who testified that 75 per cent of the plant in service during the test period had been constructed since the close of World War II at postwar prices. That evidence, in our opinion, was sufficient to enable the Commission to determine the reasonable value of the property for rate-making purposes. Such was decision of the United States Supreme Court in Railroad Commission of California v. Pacific Gas & Electric Company (1938), 302 U. S. 388, 58 S. Ct. 334, 82 L. Ed. 319. Such was the decision of the Court In Re New Jersey Power and Light Company (1952), 9 N. J. 498, 89 A. 2d 26, in which the Court said:

"In the present case the Utility introduced evidence in two categories, one of which it termed historical cost and the other present value. It defined its asserted net historical cost rate base as including 'original cost of the property together with acquisition cost (where purchased from predecessor

companies) plus experienced engineering and other overhead costs excluded from original cost on the Company's books, together with the estimated cost of plant in process of construction or projected to meet existing loads and service requirements,' and its asserted present value rate base as 'the cost new either actual or estimated of the property of Appellant reflecting price levels at December 31, 1949, less allowance for loss in value due to deterioration, obsolescence and other factors.' It now asserts that the respondent rejected all the testimony and exhibits relating to the present value of its property and 'used the cost rate base.'

"The respondent was entitled to determine the probative force of the Utility's evidence upon both of its asserted rate bases. Assuming that in doing so it eliminated for valid reasons all the Utility's evidence relating to purported 'present value' as being without sufficient weight to constitute a reasonable basis for the establishment of increased rates, that fact alone would not render its decision and order invalid, for it was left with evidence of historical cost which is admissible, and if that is sufficient or substantial, competent and relevant evidence it may be considered in connection with all the circumstances of the case, for determination of a rate base. Such was the decision under comparable conditions in Railroad Comm. of Cal. v. Pacific G. & E. Co., 302 U. S. 388, 58 S. Ct. 334, 82 L. Ed. 319, 324-325 at p. 326 (1938), in which case the U. S. Supreme Court held that the utility could not successfully contend that it was not heard by the commission, that the evidence it offered was not received and considered and its competency and weight determined by the commission, or that the commission did not place its valuation upon the property and fix the rates upon that valuation.''

██ ██ The Company in this case was given a fair hearing by the Commission; proper findings were made, and other statutory requirements satisfied. The Constitutional requirements of procedural due process, under both Federal and state constitutions, have not been overstepped. We think that it cannot be said that the Commission in taking original cost less depreciation, or net investment, as a rate base was making a finding without evidence and therefore arbitrary. We think there is no merit in the appellant's contention that the Commission erred in refusing to adopt Hatfield's estimate of $72,000,000 as a rate base.

██ ██ We also think there was no error in the action of the Commission in excluding from the rate base the items listed as $1,497,822 for telephone plant under construction, $898,132 for materials and supplies, and $156,068 for cash requirements. The exclusion of the items for telephone plant under construction, for the reasons stated in the Order of the Commission, finds ample support in the following cases: Arkansas Power and Light Co. v. Public Service Commission (1956), 226 Ark. 225, 289 S. W. 2d 668; Re: Mountain States Telephone and Telegraph Co. (1955), 76 Idaho 474, 284 P. 2d 681; Southwestern Bell Telephone Co. v. State (1951), 204 Okla. 225, 230 P. 2d 260; Re: New England Telephone & Telegraph Co. (Vt. 1951), 80 A. 2d 671; New England Telephone & Telegraph Co. v. State, (N. H. 1949), 64 A. 2d 9. ██ ██ The exclusion from the rate base of items of materials and supplies and cash requirements, under the facts disclosed by the record, also finds ample support in the decisions of other courts which have considered such items. Cincinnati v. Public Utilities Commission of Ohio (1954), 161 Ohio St. 395, 119 N. E. 2d 619; Central Maine Power Co. v. Public Utilities Commission (Me. 1954), 109 A. 2d 512; New England Telephone & Telegraph Co. v. State, (N. H. 1953), 97 A. 2d 213; Chesapeake & Potomac Telephone Co. v. Pub-

lic Service Commission (1952), 201 Md. 170, 93 A. 2d 249; Pittsburg v. Pennsylvania Public Utility Commission (1952), 370 Pa. 305, 88 A. 2d 59; State, ex rel. Utilities Commission v. Southern Bell Telephone & Telegraph Company (1954), 239 N. C. 333, 80 S. E. 2d 133.

In the case of State, ex rel. Utilities Commission v. Southern Bell Telephone & Telegraph Company, supra, the Court said:

"Neither the Utilities Commission nor the courts are the keepers of the morals of a public utility. When, in fixing rates which will produce a fair return on the investment of a utility, it is made to appear it has on hand continuously a large sum of money it is using as working capital and to pay current bills for materials and supplies, that is a fact which must be taken into consideration. And if the fund on hand is sufficient, no additional sum should be allowed at the expense of the public."

Our conclusion is that the Company has failed to sustain its attack upon the rate base of $60,568,045.

In their argument on Basic Issue No. 2 mentioned above, the appellant's attorneys say that the rate of return which the Commission claims that the appellant can earn under the rates fixed and prescribed by the Commission does not satisfy the requirements of a fair rate of return prescribed by the Mississippi statute, and does not satisfy the requirements of the state and Federal constitutions. It is argued that the Mississippi Statute does not direct the Commission to fix rates which will be merely nonconfiscatory; but the Commission is directed to fix rates which will yield a "fair rate of return" on the reasonable value of the Company's property; and that the mere fact that a rate is nonconfiscatory does not indicate that it is just and reasonable.

The right of a public utility to earn a fair or reasonable return is now well established by court and commission decisions and by specific provisions in

various statutes. Section 8 of Chapter 372, Laws of 1956, (Section 7716-08 (a), Code of 1942 Recompiled), provides that no rate demanded or received by any public utility shall exceed that which is just and reasonable, but such utility may demand, collect, and receive fair, just and reasonable rates, and that the rates prescribed by the Commission shall be such as to yield "a fair rate of return to the utility furnishing service, upon the reasonable value of the property of the utility used or useful in furnishing service." Section 11 of said Act, (Section 7716-11, Code of 1942, Recompiled), provides that the Commission shall determine "the just and reasonable rates" which will yield a fair rate of return to the utility for furnishing service. ■■ The reasonableness or unreasonableness of the rates charged, or to be charged, by a public utility for its service or product is not to be determined by any definite rule or legal formula, and is not measurable with any great degree of exactness, but is a question of fact calling for the exercise of sound discretion, good sense, and a fair, enlightened, and independent judgment. In determining whether a rate is reasonable, each case must rest on its special facts. 73 C. J. S., 1032, Public Utilities, par. 25 a, and cases cited.

Under the rule laid down in Smyth v. Ames (1898), 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819, as well as under statutes to the same effect, it has frequently been held that, generally speaking, the test of whether a rate or system of rates is reasonable is whether it yields as profit a fair return on the value of the property used and useful in the public service; if it yields a higher or lower return than is fair, it is unreasonable. In Bluefield Water Works & Improvement Company v. Public Service Commission of the State of West Virginia (1923), 262 U. S. 679, 67 L. Ed. 1176, 43 S. Ct. 675, the Court, in discussing the rate of return which will constitute just compensation to a public utility, said:

"What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the market and business conditions generally."

In Federal Power Commission v. Natural Gas Pipeline Co. (1942), 315 U. S. 575, 62 S. Ct. 736, 742, 86 L. Ed. 1037, the Court said:

"The ultimate question for our decision is whether the rate prescribed by the Commission is too low. The statute declares, sec. 4 (a), that the rates of natural gas companies subject to the Act 'shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.' Section 5 (a) directs the Commission to 'determine the just and reasonable rate' to be observed, and requires the Commission to 'fix the same by order.' It also provides that 'the Commission may order a decrease where existing rates

are unjust . . . unlawful, or are not the lowest reasonable rates.' On review of the Commission's orders by a Circuit Court of Appeals as authorized by Section 19 (b), the Commission's findings of fact 'if supported by substantial evidence, shall be conclusive.'

"By long standing usuage in the field of rate regulation the 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense. Los Angeles Gas Co. v. Railroad Commission, 289 U. S. 287, 305; Railroad Commission v. Pacific Gas Co., supra, (302 U. S. 388), 394, 395, Denver Stock Yard Co. v. United States, 304 U. S. 470, 475. Assuming that there is a zone of reasonableness within which the Commission is free to fix a rate varying in amount and higher than a confiscatory rate, see Banton v. Belt Line Ry. Corp., 268 U. S. 413, 422, 423; Columbus Gas Co. v. Commission, 292 U. S. 398, 414, Denver Stock Yard Co. v. United States, supra, (304 U. S. 470), 483, the Commission is also free under Section 5 (a) to decrease any rate which is not the 'lowest reasonable rate.' It follows that the congressional standard prescribed by this statute coincides with that of the Constitution, and that the courts are without authority under the statute to set aside as too low any 'reasonable rate' adopted by the Commission which is consistent with constitutional requirements.

"* * * If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end."

In Federal Power Commission v. Hope Natural Gas Company (1944), 320 U. S. 591, 64 S. Ct. 281, 88 L. Ed. 333, the Court said:

"The rate-making process under the Act, i. e., the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer inter-

ests. Thus we stated in the Natural Gas Pipeline Co. case that 'regulation does not insure that the business shall produce net revenues.' 315 U. S. p. 590. But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U. S. 339, 345, 346. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.''

██ ██ What appellant in this case is entitled to is ''just and reasonable'' rates which will yield ''a fair rate of return'' to the appellant upon the reasonable value of the property used or useful in furnishing service. A fair return is one which, under prudent and economical management, is just and reasonable to both the public and the utility. From the standpoint of the Company it is important that there be enough revenue not only for operating expenses but also for the capital cost of the business, which includes service on the debt and dividends on the stock. By that standard the return to the equity owner should be commensurate with returns on investments and other enterprises having corresponding risks and sufficient to assure confidence in the financial integrity of the business. What the public is entitled to demand is that no more be exacted from the rate payers than the services are reasonably worth.

■ ■ The Commission, having found that the capital structure of the Company was imprudent and uneconomical, and unfair to telephone subscribers because of its low debt ratio, had a right to adopt a hypothetical capital structure which would be less burdensome to the telephone subscribers for use in the determination of the earnings requirements of the Company. ■ ■ Although the determination of debt ratio is strictly a matter for management, its evaluation in fixing rates is an item for serious consideration by the rate-making body. ■ ■ Whether bonds or stocks are issued has a profound effect upon the amount of Federal income taxes which the Company is required to pay. Debt ratio substantially affects the amount to be collected from the rate payers for interest charges and dividends on the common stock. It is therefore an important factor in the determination of the rate of return and must necessarily be considered by and come within the authority of the body charged by law with the duty of fixing a just and reasonable rate of return. New England Tel. & Tel. Co. v. State (1953), 98 N. H. 211, 97 A. 2d 213. See also New England Tel. & Tel. Co. v. Department of Public Utilities (1951), 327 Mass. 81, 97 N. E. 2d 509; Chesapeake & Potomac Tel. Co. v. Public Service Commission (1952), 201 Md. 170, 93 A. 2d 249; Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Commission (1957), 232 La. 446, 94 So. 2d 431; New Mexico State Corp. Com. v. Mountain States Tel. & Tel. Co. (1954), 58 N. M. 260, 270 P. 2d 685; Petition of Mountain States Tel. & Tel. Co. (1955), 76 Idaho 474, 284 P. 2d 681.

■ ■ The Commission's action in disapproving the imprudent debt ratio of the Company, and in adopting a hypothetical debt ratio in the range of 45 per cent to 50 per cent for the purpose of computing the cost of capital and a proper rate of return, was in our opinion neither arbitrary nor unreasonable.

■ ■ The Commission found that with a prudent capital structure as indicated above and a rate base of $60,568,045, the net income of the Company, under the rates in effect during the test period, would be sufficient to pay the interest on debt capital and to compensate the owner of the common stock on the basis of an earning-price-ratio of 6.30 per cent or 6.40 per cent, which would commensurate with the earnings currently realized by investors in reasonably comparable enterprises. We think there is ample evidence in the record to support the Commission's finding on that point.

■ ■ In dealing with the issue of confiscation in any case the court must necessarily look to all facts and circumstances involved. A rate of return that is unreasonably low under conditions obtaining in a particular locality or section obviously might not be so regarded elsewhere if the factual situation is different. Michigan Bell Tel. Co. v. Michigan Public Service Commission (1952), 332 Mich. 7, 50 N. W. 2d 826. In Bluefield Water Works and Improvement Company case, supra, the Court stated that, "A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally." The record in this case shows, and the Commission so found, that there had been a steady decline in yields on high grade common stock, including high grade electric utility common stocks during the five-year period from 1951 to 1955. Dr. Langum, the appellant's chief economic consultant, admitted that the percentage cost of capital had not kept pace with the consumer price index or the general price level during the postwar period.

The Commission noted in its findings that Southern Bell since 1946 had increased its Mississippi intrastate rates 56 per cent, and if the higher rates made effective under bond on July 26, 1956, were approved, the total increase in the intrastate rates during the postwar period

would be 65 per cent; while interstate rates had risen only 10 per cent during the same period; that, in the City of Jackson, at the time of the hearing, the monthly rate for a one-party business telephone was $15.50 as compared with $5.50 in 1946; and that the rate for a two-party residence telephone in Jackson at the time of the hearing was $5.25 per month, or more than twice the rate of $2.40 in 1946.

The appellant has produced voluminous evidence and expert testimony to establish its claim that the rates in effect prior to July 26, 1956, were confiscatory. Yet, as we have seen above, despite a 72-day strike by its employees during the early part of 1955, the Company closed the year 1955 with earnings of $7.77 per share of common stock, a new high record since at least 1945; and AT&T's earnings were higher than at any time since 1940.

The Oklahoma Court in Southwestern Bell Telephone Company v. State (1951), 204 Okla. 225, 230 P. 2d 260, held that a rate allowance of 5¼ per cent on the rate base, as an annual return after taxes and operating expenses, for a telephone company, was not confiscatory. The Court in its opinion in that case said:

"As of the date of the hearings the common stock of American Telephone & Telgraph Company was selling to yield 6 per cent. That is on a basis substantially higher than so-called book value upon which it is shown to earn substantially more. That values of the stock are largely based upon earnings is clear from the record. It seems equally clear that so long as equity capital earns in excess of 6 per cent the rates producing such earnings could not be said to be confiscatory."

In State ex rel. Pacific Telephone and Telegraph Co. v. Department of Public Service (1943), 19 Wash. 2d 200, 142 P. 2d 498, the Court held that a rate of return for a telephone company fixed by the Department of

Public Service at 5 per cent on original cost less depreciation rate base was not so low as to amount to confiscation of the respondent's property and that the Superior Court erred in reversing the order of the department upon that phase of the case. In Michigan Bell Telephone Company v. Michigan Public Service Commission (1952), 332 Mich. 7, 50 N. W. 2d 826, the Court held that the rate of 5.51 per cent on a rate base of net investment increased by the addition of certain items of property belonging to AT&T was not confiscatory; and the Court cited in its opinion in that case Alexandria Water Company v. City Council of Alexandria, 163 Va. 512, 177 S. E. 454, in which the Court declined to hold confiscatory rates yielding a net return of 4.98 per cent. In State ex rel. Utilities Commission v. Southern Bell Telephone and Telegraph Company (1954), 239 N. C. 333, 80 S. E. 2d 133, the Court said: "Presently we are not prepared to say that a net return of 5.40%— over and above all taxes—is inadequate. That is a question for the Commission to decide."

 The Commission in the case that we have here found that, under the rates in effect during the test period, the appellant, with a prudent capital structure, would enjoy a net operating income in the range of $3,005,785 to $3,079,785 which would represent a rate of return in the range of 4.96 per cent to 5.08 per cent on the reasonable value of the Company's intrastate property. Such rate of return may appear to be low, as compared with the rates allowed in some other states in which the appellant operates. But the rate of return in our opinion is not confiscatory; and we think that it cannot be said that the rates which produce that return are unjust or unreasonable, or that the rate of return itself is not a fair rate of return.

"The function of rate-making is purely legislative in character. It is not within the power of a court to fix the rates to be charged by public utilities, although

a court may restrain the imposition of confiscatory rates, or, under the Public Utility Act, determine whether the rates as fixed are supported by substantial evidence or within the other statutory restrictions set forth in Code Sec. 7716-26; 43 Am. Jur., Public Utilities and Services, Sec. 83, pages 185-191.'' Mississippi Public Service Commission v. Home Telephone Company, Inc. (Miss. 1959), 110 So. 2d 618.

██ ██ The appellant in this case asserted that the return permitted by the prescribed rates in effect during the test period was confiscatory; and the burden of proof rested on the appellant to establish such fact by clear and convincing proof. Lindheimer v. Illinois Bell Telephone Company (1934), 292 U. S. 151, 54 S. Ct. 658, 78 L. Ed. 1182; Railroad Commission of California v. Pacific Gas & Electric Company (1938), 302 U. S. 388, 58 S. Ct. 334, 82 L. Ed. 319; Southwestern Bell Telephone Co. v. State (1951), 204 Okla. 225, 230 P. 2d 260; Michigan Bell Telephone Company v. Michigan Public Service Commission (1952), 332 Mich. 7, 50 N. W. 2d 826. We think the appellant has failed to sustain the burden of proof resting on it.

██ ██ We have carefully reviewed all questions of law and of fact that have been presented for our consideration on this appeal, as it was our duty to do, in view of the constitutional issue raised by the appellant's claim that the rates approved by the Commission were confiscatory; and we find no error of law which would justify a reversal of the order of the Commission or the decree of the lower court. ██ ██ The record shows that a fair hearing has been given to the appellant, proper findings have been made by the Commission, and other statutory requirements satisfied. The limits of due process have not been overstepped. The Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result. We find that the order of the Commission is supported by sub-

stantial evidence, and is not contrary to the manifest weight of the evidence, or in excess of the statutory authority or jurisdiction of the Commission; and the order violates no constitutional rights. We find that the rates prescribed by the Commission are just and reasonable and such as to yield a fair rate of return to the appellant upon the reasonable value of its property.

The order of the Commission and the decree of the lower court are therefore affirmed.

Affirmed.

All justices concur.